UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 OCT 22  P 4: 02

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| CHARLES LANGONE, as FUND MANAGER of the NEW ENGLAND TEAMSTERS AND TRUCKING INDUSTRY PENSION FUND<br><br>Plaintiff,<br><br>v.<br><br>USCO DISTRIBUTION SERVICES, INC., a/k/a USCO LOGISTICS SERVICES, INC.<br><br>Defendant. | C.A. No. 04cv10041 PBS |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

I.    Introduction

This is an action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, *et seq.*, brought on behalf of the New England Teamsters and Trucking Industry Pension Fund ("Pension Fund" or "Fund") for damages and injunctive relief arising from unpaid and delinquent contributions.

Plaintiff seeks to collect on a payroll audit conducted by the Pension Fund in April 2001 for the years 1997 through 2000, which includes contributions for "temporary employees" supplied by temporary staffing agencies. Defendant has failed to make payment pursuant to the audit, provided incomplete records in response to the audit, and continues to fail to make contributions to the Fund for temporary employees at its Franklin, Massachusetts facility, in violation of Section 515 of ERISA, 29 U.S.C. §1145.

II.    Facts

The Facts necessary to determine the issues in the instant case are set forth in the Plaintiff's Statement of Undisputed Facts, which is hereby incorporated by reference.

Defendant USCO Distribution Services, Inc., a/k/a USCO Logistics Services, Inc. ("USCO"), was party to a collective bargaining agreement with the International Brotherhood of Teamsters, Chauffeurs, Warehouse Employees and Helpers Union, Local Union 829 ("Local 829"), with effective dates of September 1, 1996 through August 31, 2001 ("1996-2001 agreement"). On or about March 8, 2000, Local 829 merged with Teamsters Local 25 ("Local 25"). Teamsters Local 25 subsequently entered into a collective bargaining agreement with USCO with effective dates of September 1, 2001 through August 31, 2006 ("2001-2006 agreement").

The Pension Fund

The New England Teamsters and Trucking Industry Pension Fund is a defined benefit multi-employer pension plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). The Fund was established for the purpose of receiving contributions and providing pension benefits to eligible employees pursuant to an Agreement and Declaration of Trust dated April 11, 1958 ("the Trust Agreement"), which has been amended from time to time. The Fund is administered by an eight-member Board of Trustees in accordance with the terms of the Trust Agreement and the Rules and Regulations of the New England Teamsters and Trucking Industry Pension Plan ("Pension Plan" or "Plan"). Contributions are paid to the Fund at an hourly rate determined by collective bargaining agreements, as defined by Article I, Section 1.08 of the 1997 Rules and Regulations of the Pension Plan, between contributing employers and local Teamster

unions participating in the Fund. Contributions are paid on behalf of employees for each hour of employment "covered" by these collective bargaining agreements. Article IV of the Trust Agreement provides that the Trustees of the Fund shall have the power to

> construe, with discretionary authority, the provisions of this Trust Agreement, or the Plan adopted hereunder, and the terms thereof, and any construction adopted by the Trustees in good faith shall be binding upon the unions, the Employers and the Employees and their families, dependents, beneficiaries and/or legal representatives.

Article IV of the Trust Agreement further provides that the Trustees have the authority to "reconcile, determine, interpret and construe, with discretionary authority, any question or dispute arising in connection with definitions of terms, right, status or classification of employees or any other dispute or claim arising under the Plan . . ." Article X of the Trust Agreement provides the Trustees with "full discretionary authority with respect to the interpretation and construction of the Plan."

The Trust Agreement contains a Standard Participation Agreement titled "Mandatory Contract Language for Pension Fund," which USCO entered into on September 1, 1982, pursuant to which it agreed to include the following pension language in any collective bargaining agreement:

> (a) This Pension Article shall supersede and prevail over any other inconsistent provisions or articles contained within this agreement.
> (b) Commencing with the [first day of September 1981], and for the duration of the current collective bargaining agreement, between [Local Union 829] and the Employer, and any renewals or extensions thereof, the Employer agrees to make payments to the New England Teamsters and Trucking Industry Pension Fund for each and every employee performing work within the scope of and/or covered by this collective bargaining agreement, whether such employee is a regular, probationary, temporary or casual employee, irrespective of his status as a member or non-member of the Local Union, from the first hour of employment subject to this collective bargaining agreement . . .

3

<u>The Collective Bargaining Agreements</u>

Both collective bargaining agreements recognize the Union as the exclusive collective bargaining representative for "all employees covered by the agreement", and provide that the agreements cover "all Warehouse Employees below the grade of Supervisory Foreman with the exception of Office Help" at USCO's facility located at 12 Forge Park Drive, Franklin, Massachusetts.

Both the 1996-2001 agreement and the 2001-2006 agreement contain the same pension language as that found in the above-cited Standard Participation Agreement, whereby contributions are required for "each and every employee performing work within the scope of and/or covered by" the collective bargaining agreement, including "temporary employees".

<u>The Audit</u>

On April 5, 2001, the Fund's auditor, Tom McMorrow, conducted an audit of USCO for the years 1997 through 2000. The audit was done in two parts- January 1, 1997 through March 31, 2000, and April 1, 2000 through December 31, 2000. Mr. McMorrow's first audit determined that USCO owed the Fund $14,264.67 for contributions for all employees, including employees supplied by temporary staffing agencies, from January 1, 1997 through March 31, 2000. Mr. McMorrow noted: "The Payroll records provided by the Employer were not complete. There were obvious indications that many of the records for 'Temporary' employees were missing or that those employees were unable to be identified."

Mr. McMorrow's second audit determined that USCO owed the Fund $5,912.39 in contributions for hours of all employees, including temporary employees supplied by

temporary staffing agencies, from April 1, 2000 through December 31, 2000. Mr. McMorrow is now deceased.

The audits were conducted pursuant to the pension provision of the 1996-2001 agreement, which provides the Trustees with the authority to have an audit done of USCO's payroll and wage records for all employees performing work within the scope of and/or covered by the collective bargaining agreement.

Previous Contributions

On four separate occasions between April 2000 and January 2001, USCO made contributions for temporary employees supplied by staffing agencies. USCO made contributions for 468 hours worked by "temporary employees" in March 2000; contributions for 377 hours worked by "temps" in August 2000; contributions for 688 hours worked by "temps" in September 2000; and contributions for 836 hours worked by "temps" in December 2000. It is undisputed that these contributions were for temporary employees supplied by an outside staffing agency.

On each occasion, the notation "temporary employees" or "temps" was handwritten on the remittance report, and signed by management personnel.

During negotiations for the 2001-2006 agreement, the Union refused USCO's request to change the pension language so that contributions would not be due for temporary employees.

The Business of USCO

USCO is engaged in the business of third party warehouse and inventory management. At its warehouse in Franklin, Massachusetts, USCO receives merchandise, stores it, and then later ships it to other locations.

Pursuant to Article XIII of the 1996-2001 agreement and Article 27 of the 2001-2006 agreement, there are three bargaining unit classifications at USCO's warehouse: "Warehouse Persons", "Selectors", and "Picker-Packers". Warehouse Persons generally handle the merchandise that arrives at the warehouse or is selected to be shipped out of the warehouse. This work involves loading and unloading of trucks and containers, configuring pallets, and storing and retrieving stock using various tools and equipment. Selectors select product located on the warehouse floor, while Picker-Packers handle the shipping and receiving and packaging of merchandise.

Steven Cooke and William Glover are the two main supervisors in the warehouse. They supervise the bargaining unit employees, and they also serve as the supervisors for all temporary employees provided by temporary staffing agencies. When a temporary employee first reports to work at USCO, USCO's supervisors or management personnel conduct his safety training, review the manner in which the work is to be completed, and explain USCO's work rules and policies. Mr. Cooke and Mr. Glover make the decisions as to where the temporary employees are to be assigned in the warehouse, and determine the duration of their tasks or projects. There are no supervisors from the temporary employment agency on site at the USCO warehouse. Supervisors Cooke and Glover discipline temporary employees, and have in the past sent temporary employees home for disciplinary reasons. The temporary employees and the bargaining unit employees interact with one another and work side by side performing the same warehouse work for USCO.

USCO is currently party to an agreement with Adecco North America, LLC ("Adecco"), titled "Agreement to Furnish Employees", pursuant to which Adecco

6

supplies temporary employees to USCO to perform warehouse work. The agreement states that the employees supplied by Adecco to USCO work under the supervision and control of USCO's supervisors; must comply with USCO's rules, regulations, policies, and procedures; and provides USCO with authority to terminate the temporary employees. In addition, pursuant to the agreement, USCO reviews and approves the time records of the temporary employees. The agreement also requires USCO to provide all necessary tools and equipment to the temporary employees.

USCO at times has employed the same individual temporary employees for up to two consecutive working months, but has made sure not to allow a temporary employee to work thirty (30) consecutive days at the warehouse so as not to trigger Article III of the 1996-2001 agreement or Article 5 of the 2001-2006 agreement (Probationary Period), whereby an employee who works thirty consecutive working days becomes a regular bargaining unit employee and a member of the Union.

To date, USCO has refused to make any payments on the audit under the theory that it is not responsible for making contributions to the Fund on behalf of temporary employees. It is the Fund's contention that temporary employees included in the audit are employees performing work within the scope of and/or covered by the collective bargaining agreement.

III.   Argument.

    A.   Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment where "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Perez De La Cruz v. Crowley Towing and Transportation Co.*, 807 F.2d 1084, 1086 (1st Cir. 1986), *cert. denied*, 487 U.S. 1050 (1987).

Material facts are those that have the potential to affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). The existence of a factual dispute will not necessarily defeat a summary judgment motion. "[T]he requirement is that there must be a *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue for trial exists where the record taken as a whole could not lead a rational trier of facts to find for the nonmoving party. *Matsushita Electric Industry Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

B.   The Fund's Interpretation of "Temporary Employees" as that Term is Used in the Pension Provision of the Collective Bargaining Agreement is Neither Arbitrary Nor Capricious.

It is the Trustees of the Fund's position that the pension language in the Standard Participation Agreement (and also found in the collective bargaining agreements) requires USCO to make contributions for temporary employees supplied by staffing agencies. The proper standard for analyzing the Trustees' interpretation is whether it is arbitrary and capricious.

In *Firestone v. Bruch*, 489 U.S. 101 (1989), the Supreme Court set forth the standard of judicial review for decisions made by pension fund fiduciaries under ERISA.

8

It held that a challenge to a denial of benefits will be reviewed under a *de novo* standard unless the benefit plan gives the fiduciary discretionary authority to construe the plan and/or determine eligibility for benefits. If the requisite discretionary language is contained in the plan, the fiduciary's decisions will be reviewed under an "arbitrary and capricious" standard. *Firestone*, 489 U.S. at 114-116.

This standard was followed by the First Circuit in *Diaz v. Seafarers International Union, et al.*, 13 F.3d 454 (1994). The Court held that where the issue is the Trustee's interpretation of the "rules promulgated by the trustees pursuant to the powers delegated by that [trust instrument]," an arbitrary and capricious standard is appropriate. See also *Pari-Fasano v. ITT Hartford Life*, 230 F.3d 415, 418 (1st Cir. 2000).

The Trust Agreement confers upon the Trustees of the Fund the sole power to establish the Pension Plan. Specifically, it empowers the Trustees:

> . . . to construe with discretionary authority, the provisions of this Trust Agreement, or the Plan adopted hereunder, and the terms thereof, and any such construction adopted in good faith is binding upon the Unions, the Employers, and the Employees and their families, dependents, beneficiaries and/or legal representatives.

Article X, Section 10.03 of the Plan states that "The Trustees shall have full discretionary authority with respect to the interpretation and construction of the Plan"; that they "shall be the judges of the standard of proof required in any case and of the application and interpretation of the Plan"; and that their decisions shall be binding on all parties.

The language therefore accords full discretionary authority upon the Trustees to construe the terms of the Trust Agreement and Plan. The pension provision found in the collective bargaining agreements at issue is the same language as that found in the Standard Participation Agreement that the Fund mandates be included in all Teamster collective bargaining agreements. The Fund has always interpreted this pension language

9

to require employers to make contributions for each employee performing work within the scope of and/or covered by the collective bargaining agreement, and that contributions for temporary employees supplied by a staffing agency are included within the definition of "temporary employee" for pension purposes. Therefore, the "arbitrary and capricious" standard must be employed in interpreting the pension language in question here.

C.    USCO is Obligated to Make Contributions for Temporary Employees.

The pension language contained in both collective bargaining agreements clearly and unambiguously requires USCO to make pension contributions on behalf of each and every employee performing work within the scope of and/or covered by the collective bargaining agreement, including "temporary" employees.

> "Determining whether temporary employee hours are covered by the collective bargaining agreement is an issue of contract interpretation because 'employers must contribute to multiemployer benefit plans according to the terms of the collective bargaining agreement.'" *National Shopmen Pension Fund v. Burtman Iron Works, Inc.,* 148 F. Supp.2d 60 (D.D.C. 2001), quoting *Alston v. Dollar Rent A Car Systems, Inc.,* 1998 U.S. Dist. LEXIS 13084 (S.D.N.Y. Aug. 24, 1998).

The Pension provision (Article VII in the 1996-2001 agreement and Article 15 of the 2001-2006 agreement) states that USCO shall make payments to the Fund

> for ***each and every*** employee ***performing work within the scope of*** and/or covered by this collective bargaining agreement, whether such employee is a regular, probationary, ***temporary*** or causal employee, ***irrespective of his status*** as a member or ***non-member of the Local Union*** from the first hour of employment . . . (emphasis added).

This pension language clearly and unambiguously requires USCO to make contributions to the Fund on behalf of "temporary employees". First, the Pension article requires contributions for "each and every" employee who "perform[s] work within the scope of and/or covered by" the agreement. The work performed by the temporary

employees leased by USCO from staffing agencies is the same type of warehouse work as that performed by bargaining unit members. The temporary employees and the bargaining unit employees work in concert performing warehouse work. Temporary employees perform the same stocking, loading and unloading of trucks, and shipping and receiving of merchandise as is performed by bargaining unit employees.

Furthermore, the Pension article specifically includes "***temporary employees***" as one of the classifications of employees for whom pension contributions must be made. There is nothing in the collective bargaining agreement that states or implies that temporary employees supplied by a staffing agency are not "temporary employees" under the agreement. The pension article lists every possible classification of employee- "regular, probationary, temporary, or casual", and mandates that contributions be made for each classification. USCO therefore cannot credibly argue that those employees leased from temporary staffing agencies do not qualify as "temporary" employees as that term is used in the pension article of both collective bargaining agreements. USCO Distribution Center Manager Steven Cooke admitted that there is no other classification of worker at USCO who is referred to as a "temp" other than those individuals supplied through the temporary staffing agency. In construing contract language, courts seek to "'render no term meaningless.'" *Browning Ferris Indus. v. Union De Tronquistas Local 901*, 29 F.3d 1, 2 (1st Cir. 1994), quoting *Jiminez v. Peninsular and Oriental Steam Nav. Co.*, 974 F.2d 221, 223 (1st Cir. 1992).

There are two seminal cases where the courts found that contributions were due for temporary employees. In *National Shopmen Pension Fund v. Burtman Iron Works, Inc.*, 148 F. Supp.2d 60 (D.D.C. 2001), the trustees of a pension fund brought suit against

an employer for delinquent contributions for production and maintenance workers, including those who were hired through two temporary employment agencies. Although the employers admitted that 95% of the temporary employees' time was spent performing work covered by the collective bargaining agreement, they still argued that they were not obligated to make contributions for the temporary employees because they were not "employees" under the common law definition of "employee." *Id.* at 63.

The court first noted that determining whether contributions must be made on behalf of temporary employees is strictly an issue of contract interpretation. *Id.* Section 1(A) of the agreement stated that "this Agreement shall be applicable to all full-time production and maintenance employees of the Company (hereinafter referred to as 'employees') engaged in the fabrication of iron, steel, metal and other products, or in maintenance work in or about the Company's plant . . ." *Id.* at 64. The court held that because the temporary employees in question *engaged in the described work and worked full time*, the agreement unambiguously required contributions on their behalf. *Id.*

The Court concluded that because the collective bargaining agreement applied to full-time production and maintenance employees, all of the full-time employees engaged in that work were covered by the agreement, including temporary employees supplied by a staffing agency. *Id.* The court added that "because the collective bargaining agreement here does not specifically distinguish or exclude temporary employees, the agreement requires contributions for temporary employees." *Id.*

The court in *National Shopmen Pension Fund* likened the situation to that found in *Pierce County Hotel Employees and Restaurant Employees Health Trust v. Elks Lodge, B.P.O.E. No. 1450*, 827 F.2d 1324 (9th Cir. 1987), where the collective bargaining

12

agreement between the union and the employer required the employer to make contributions "for any person performing work covered by this agreement, whether such employees are members of the union in good standing or not." *Id.* at 1326. Although the union and the employer had over the years orally agreed to waive contributions for temporary employees, the Fund brought suit seeking payment for delinquent contributions for temporary employees. *Id.*

Article I of the collective bargaining agreement recognized the union as the exclusive bargaining agent for all Lodge employees working in the specified classifications. Employees were defined as "all Lodge employees excluding office employees, owner-supervisors and their close relatives." *Id.* at 1327. The Court concluded that "nonunion temporary employees performing work in the agreements' specified classifications are members of the bargaining unit and are defined as employees under the agreements." *Id.* The agreement further provided that the Lodge was to make contributions for "any person performing work covered by this agreement, whether such employees are members of the union in good standing or not." *Id.* The Court concluded that the language required contributions for

> *any* person performing work under the agreement, meaning any employee in the bargaining unit as defined by Article I. The class of bargaining unit employees is not limited to union members. The contribution provisions can reasonably be read but one way: the Lodge must make contributions for any covered employee, whether or not a union member. *Id.*

Here, the language in the collective bargaining agreement is very similar to that found in *National Shopmen Pension Fund,* as it expressly requires USCO to make contributions for "each and every employee," but also specifically makes reference to "temporary employees" who perform work "within the scope of and/or covered by" the

collective bargaining agreement. Since the temporary employees supplied by staffing agencies perform work "within the scope of" the collective bargaining agreement, contributions are due on their behalf.

Finally, the Pension Article expressly states that it shall supersede and prevail over any other inconsistent provisions in the collective bargaining agreement. Thus, even assuming, *arguendo*, that any other allegedly conflicting language even exists elsewhere in either of the collective bargaining agreements, the pension article would prevail.[1]

D.    The Defendant's Actions in Making Contributions Support the Fund's Reading of the Collective Bargaining Agreement.

Assuming, *arguendo,* that the language of the agreement is not clear and unambiguous, USCO's prior contributions to the Fund provide extrinsic evidence that the parties interpreted the collective bargaining agreement as requiring pension contributions for temporary employees leased from a staffing agency.

"When the operation of an ordinary contract is not clear from its language, a court generally may consider extrinsic evidence to determine the intent of the parties." *Northwest Administrators, Inc. v. Sacramento Stucco,* 86 F.Supp. 2d 974, 980 (N.D.Ca. 2000); *Casey v. Lifespan Corporation,* 62 F.Supp. 2d 471, 480 (D.R.I. 1999) ("If, on its face, the contract appears ambiguous, the court must then consider extrinsic or parole evidence to determine the intent of the parties."). In addition, "this principle is applied more liberally in the case of a collective bargaining agreement." *Sacramento Stucco* at 980. Thus, in reviewing extrinsic evidence to help illuminate ambiguous contract language, a trier of fact may "'consider the parties' conduct subsequent to contract

---

[1] See: *Central Pennsylvania Teamsters Pension Fund v. Power Packaging, Inc.,* 2004 U.S. Dist. LEXIS 9914, 33 Employee Benefits Cas. (BNA) 1432 (May 27, 2004) (In finding that contributions were due for employees leased to defendant company by a staffing agency, the Court noted that the pension section of the agreement "cannot be limited by other language found in the CBAs.").

formation . . . and such conduct is to be given great weight.'" *Id.*, quoting *Arizona Laborers, Teamsters and Cement Masons Local 395 Health and Welfare Trust Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1517 (9th Cir. 1985).

On four separate occasions between April 2000 and January 2001, USCO made contributions to the Fund for hours worked by temporary employees supplied by a staffing agency. Beginning on April 14, 2000, USCO made contributions to the Fund for 468 hours worked by "temporary employees" in March 2000. Maureen Boehling, USCO's former Office Manager, signed the remittance report for March 2000 on the line next to the phrase "prepared by", and the report included a handwritten notation that the hours were for "temporary employees".

Then, on or about September 6, 2000, USCO made contributions for 377 hours worked by "temps" in August 2000; made contributions on or about October 30, 2000, for 688 hours worked by "temps" in September 2000, and made additional contributions on or about January 1, 2001 for 836 hours worked by "temps" in December 2000. On each occasion, the notation "temps" was handwritten on the remittance report, and each report was signed by Steven Cooke next to the line marked "prepared by." Cooke has admitted that in writing the phrase "temps" on the remittance reports, he was referring to those employees supplied to USCO by an outside staffing agency.

These reports, and the contributions made on behalf of the "temps", constitute additional evidence that USCO recognized that it was required, pursuant to the terms of the pension article in the collective bargaining agreement, to make contributions for temporary employees supplied by staffing agencies.

Second, during the last round of negotiations, Eric Peterson, the Company's chief negotiator, proposed changing the language of the pension provision so that it would no longer have to make contributions on behalf of temporary employees, but the Union refused to negotiate a change in the pension language.

Thus, based upon USCO's actions in acknowledging its obligations, it is obvious the parties understood that contributions are required for hours worked by temporary employees supplied by outside staffing agencies.

E.    The Workers Supplied to USCO by Temporary Staffing Agencies are "Employees" of USCO.

Again assuming, *arguendo*, that the collective bargaining agreement is ambiguous, USCO's apparent argument that employees supplied by a temporary agency are not "employees" or "temporary employees" of USCO, and that therefore no contributions are due, must also fail.

In determining whether an individual is an employee under ERISA,[2] the United States Supreme Court employs the following "common law" test:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to

---

[2]    The Plaintiff suggests, should the Court find the collective bargaining agreements to be ambiguous in terms of the definition of "employee" (or the extrinsic evidence to be unavailing), that the proper test for determining whether the temporary employees supplied by the staffing agencies are "employees" is the common law test enunciated by the United States Supreme Court in *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 751-752 (1989), and reiterated in *Nationwide Mutual Insurance Company v. Darden,* 503 U.S. 318, 323 (1992). However, it is important to note that this case does not turn on whether the temporary employees would have standing for a claim for benefits under ERISA, or whether they are entitled to pension benefits under the New England Teamsters and Trucking Industry Pension Plan. Rather, the issue is whether the workers supplied to USCO by a temporary staffing agency are "employees" performing work within the scope of the collective bargaining agreement (or for that matter "temporary employees" performing work within the scope of the collective bargaining agreement) for whose hours USCO must make contributions. The fact that a temporary employee may not qualify to receive benefits from the Fund does not impact whether that same temporary employee is an "employee" for whose hours USCO must make contributions to the Fund. While *Darden* used the common law test, it should be noted that that case involved the question of whether the plaintiffs had standing *under ERISA* as "employees". That is not the same issue as the one presented here.

this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Nationwide Mutual Insurance Company v. Darden,* 503 U.S. 318, 323 (1992), quoting

*Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 751-752 (1989). The First

Circuit has accepted this test for determining whether one is an "employee" for ERISA

purposes. *Speen v. Crown Clothing Corporation,* 102 F.3d 625, 631, 634 (1st Cir. 1996).

The first factor is the degree of direction and control exercised by USCO over the

work performed by the temporary employees. Although a temporary staffing agency

supplies the employees to USCO, when these employees report to work at USCO for the

first time, they are trained and instructed on how to do the job by USCO's supervisors

and management personnel. USCO supervisors advise the temporary employees as to

USCO's procedures and rules, and the temporary employees are subject to USCO's work

rules. Supervisors Steven Cooke and William Glover, who are also the supervisors for

the bargaining unit employees, oversee and supervise all of the temporary employees.

These USCO supervisors decide which assignments and projects the temporary

employees are to perform, and for how long. Supervisors have the authority to, and have,

in the past, disciplined temporary employees, such as sending temporary employees

home for the day. No one from the temporary staffing agency appears on site at USCO to

supervise the work of the temporary employees. The temporary employees answer only

to USCO's supervisors while working at USCO.

The temporary employees work side by side with the bargaining unit employees, performing many of the same tasks as those performed by bargaining unit members. Like the bargaining unit employees in those classifications, the temporary employees work on-site at USCO's warehouse stocking and picking merchandise, loading and unloading trucks and products, and shipping and receiving merchandise. All tools and instrumentalities needed to complete the work are provided by USCO, including hand trucks, pallet jacks, boxes, and packaging materials. The work performed by the temporary workers, involving various aspects of warehouse storage and shipping, constitutes the primary business of USCO. This is not work for which the temporary staffing agency needs to provide special training, or which requires pre-existing specialized skills. USCO retains temporary employees for as long as it desires. On several occasions, the same temporary employees have worked for up to eight consecutive weeks, save for the occasional day off so as not to trigger regular bargaining unit employee status.[3]

The terms of the agreement between USCO and staffing agency Adecco North America, LLC titled "Agreement to Furnish Employees", further bolsters the Fund's position that the temps are employees of USCO. The current agreement, pursuant to which Adecco supplies temporary employees to USCO, states that temporary employees are to perform their duties "under the supervision and control of USCO's designated supervisors, in accordance with USCO's directions and instructions." Said temporary employees are required to comply with USCO's "rules, regulations, and procedures."

---

[3] Article III of the 1996-2001 agreement and Article 5 of the 2001-2006 agreement provide that all new employees shall be on a 'Temporary' or 'Probationary' basis for a period of thirty days, and that upon the completion of thirty consecutive working days, one qualifies as a "Regular Employee" and a member of the Union.

Pursuant to the agreement, USCO has the authority to remove or terminate a temporary employee for any reason, and it reviews and approves time records filled out by the temporary employees. USCO is also required under the terms of the agreement to "supervise, direct and control the day-to-day work and/or tasks performed" by the temporary employees while at USCO, and must furnish the temporary employees with all necessary tools and materials, including safety equipment, required to perform the work.

Thus, it is clear that the significant majority of the common law factors for establishing employee status under *Reid* and *Darden* are present here.

Even if USCO does not pay the temporary employees directly or provide them with other benefits[4], this alone does not disqualify the temporary workers as "employees" of USCO. "The common law test requires that 'all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Speen v. Crown Clothing Corporation,* 102 F.3d 625, 631 (1st Cir. 1996), quoting *Darden,* 503 U.S. at 324. Thus, whether the individuals supplied to USCO are temporary "employees" must be viewed within the totality of the circumstances.

Additionally, it should be noted that "workers employed by staffing agencies and leased full-time by an employer may also be considered employees of that employer even though they are not on that employer's payroll." *Central Pennsylvania Teamsters Pension Fund v. Power Packaging, Inc.,* 2004 U.S. Dist. LEXIS 9914, 33 Employee Benefits Cas. (BNA) 1432 (E.D. Penn.) (May 27, 2004). Thus, even assuming, *arguendo,* that the individuals supplied by the staffing agency may be deemed employees

---

[4] While Adecco insures the temporary employees, pursuant to Section 8.5 of its agreement with USCO, Adecco lists USCO as the "Alternate Employer" with respect to its employee insurance policies.

of the staffing agency, this does not prevent them from also being employees of USCO. The two concepts are not mutually exclusive.

Based upon the above common law factors, the temporary employees supplied to USCO are "employees" (specifically "temporary employees") of USCO, and therefore USCO is required to make contributions for the hours they work.

IV.    Conclusion

As the collective bargaining agreement clearly and unambiguously requires USCO to make contributions to the Plaintiff for temporary employees, the Court should grant the Plaintiff's Motion for Partial Summary Judgment and find that USCO is required to make contributions for temporary employees, and order the parties to commence damages discovery.

Dated: October 22, 2004                          Respectfully submitted

                                                 For the Plaintiff
                                                 By His Attorneys


                                                 _____
                                                 Catherine M. Campbell (BBO #549397)
                                                 Jonathan M. Conti (BBO # 657163)
                                                 FEINBERG, CAMPBELL & ZACK, P.C.
                                                 177 Milk Street
                                                 Boston, MA 02109
                                                 (617) 338-1976

                        Certificate of Compliance

    I, Jonathan M. Conti, hereby certify that pursuant to Local Rule 7.1, I have conferred in good faith with counsel of record in this matter.


                                                 _____
                                                 Jonathan M. Conti

## CERTIFICATE OF SERVICE

I, Jonathan M. Conti, hereby certify that I caused a copy of the foregoing to be mailed this date by certified mail, return receipt requested, to Gregory C. Keating, Esq., Littler Mendelson, P.C., One International Place, Suite 2700, Boston, MA 02110.

Date: October 22, 2004

Jonathan M. Conti