UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 OCT 22 P 4:24

U.S. DISTRICT COURT
DISTRICT OF MASS.

CHARLES LANGONE, as FUND MANAGER )
for the NEW ENGLAND TEAMSTERS and )
TRUCKING INDUSTRY PENSION FUND, )
    Plaintiff, )
     )
v. ) Civil Action No. 04-10041-PBS
     )
USCO DISTRIBUTION SERVICES, INC. )
a/k/a USCO LOGISTICS SERVICES, INC. )
    Defendant. )

**STATEMENT OF UNDISPUTED FACTS SUBMITTED IN SUPPORT OF DEFENDANT USCO DISTRIBUTION SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT**

    USCO Distribution Services, Inc. submits this Statement of Undisputed Facts in Support of its Motion for Summary Judgment.[1]

A.    <u>The USCO Franklin, Massachusetts Facility</u>.

    1.    USCO maintains a facility in Franklin, Massachusetts. (Affidavit of Stephen Cooke ("Cooke Aff."), submitted herewith, at Tab 1).

    2.    At its Franklin facility, USCO provides logistical, freight and warehousing services to clients. (Id. ¶ 3).

    3.    These services involve transporting a client's inventory to USCO warehouses and then managing the inventory USCO receives. (Id.).

    4.    USCO employs only about 25-30 employees at the Franklin facility. (Id. ¶ 5). The Teamsters Union represents non-management warehouse employees in Franklin. (Id.).

---

[1] In 2002, Kuehne & Nagel Logistics purchased USCO. Throughout this Statement, Kuehne & Nagel and USCO are collectively referred to as "USCO."

5. USCO employees known as "warehouse persons" are responsible for handling and storage of inventory for clients. (Id. ¶ 6). The following are examples of tasks completed by USCO employees who are warehouse persons:

- handling product as it arrives on-site at USCO;
- verification of serial numbers for product arriving and departing the USCO facility;
- unloading product arriving on forklift-ready pallets ("palletized" product);
- unloading product arriving in floor-loaded containers (i.e. "unpalletized" product);
- staging product for stocking after it arrives on-site;
- stocking product after it arrives on-site;
- "picking" product for shipment outbound;
- preparing product for shipment outbound;
- weighing product; and
- creating and maintaining records of products arriving or departing from the USCO site via computer program.

6. During high-volume periods or for special projects, USCO may call upon one or more staffing agencies for temporary assistance on USCO projects. (Id. ¶ 7).

7. The few temporary workers that periodically work at this facility are not part of the bargaining unit, are not members of the Teamsters Union, and are not employees of USCO. (Id. ¶ 8). Rather, the temporary workers are employees of a staffing agency that supplies temporary workers to USCO. (Id.).

8. From 1997 to the present, USCO used several different agencies to provide temporary workers and in 2002, USCO signed a national contract with an agency called Adecco for the provision of temporary worker assistance. (Id. ¶ 9) USCO has had no control over which temporary workers it receives from its temporary staffing agencies. (Id. ¶ 11).

9. Temporary workers normally stay no longer than a few days or a week, and do not remain at USCO' Franklin facility for as long as 30 days. (Id. ¶ 23).

10. USCO has consistently treated temporary workers differently from USCO employees. (Id. ¶ 10).

11. USCO does not hire or fire temporary workers. (Id. ¶ 12). Rather, their employer, the temporary staffing agency, is responsible for hiring and terminating them. (Id.).

12. When arriving at USCO, temporary workers use different methods of accounting for time than USCO employees do. (Id. ¶ 13). USCO employees are given swipe cards while temporary workers must use a traditional time clock to account for their time. (Id.).

13. USCO does not pay temporary workers, nor does it provide these temporary workers with insurance or other benefits. (Id. ¶ 14). The temporary staffing agency assigns, schedules and pays the temporary workers. (Id. ¶¶ 14, 15).

14. The work performed by temporary workers for USCO is menial and basic. (Id. at ¶ 16). Work done by temporary workers is often work that USCO employees (who are members of the bargaining unit) will not or would rather not do. (Id.). For example, temporary workers often do work called "lumping" which entails simply unloading heavy unpalletized product which arrives in containers. (Id.). Temporary workers also may help with special projects which USCO employees will not or would rather not do, such as placing pricing stickers or other labels on thousands of units of individual product. (Id.).

15. Further, temporary workers are not permitted to do the majority of work that USCO warehouse person employees do. (Id. at ¶ 17). In particular, temporary workers may not: store product into locations, and instead are limited to work only with floor-loaded unpalletized product; conduct counts of inventory; verify serial numbers for product arriving and departing

the USCO facility; "pick" product for shipment outbound; weigh product; create and maintain records of products arriving to, stored at, or departing from the USCO site via computer program: process any small parcels through the Company's small parcel shipping station; or use any of USCO's computer systems. (Id.).

16. Temporary workers use few of USCO's tools while working on USCO projects and are not permitted to use any mechanized tool or vehicle, such as a forklift, when working with product. (Id. ¶ 18).

17. Any training or supervision of temporary workers by USCO is minimal as the work is basic. (Id. ¶ 19). Moreover, in many instances, the temporary agency sends its own lead person to supervise the workers. (Id.).

18. USCO only rarely disciplines temporary workers, and even then, they are not subject to the lengthy disciplinary processes afforded to USCO warehouse employees pursuant to the Collective Bargaining Agreement. (Id. ¶ 20).

19. In all cases, temporary workers require substantially less oversight on projects than USCO employees. Throughout the day, a USCO employee is required to account with USCO's central dispatch for the time he or she spends on a particular task according to client account. (Id. ¶ 21). This is because USCO employees normally work on tasks for many different client accounts in a single day. (Id. ¶ 22). USCO employees (both union and management) merely check on temporary workers a few times per day to make sure that they are on-track. This is because temporary workers rarely do work for more than one client account in a given day. (Id. ¶ 21).

20. In 2002, USCO signed a national contract with a single temporary staffing agency, Adecco, for the provision of temporary worker assistance. A true and accurate copy of

the Agreement between Adecco and USCO, hereinafter "Adecco contract," is attached to the Affidavit of Gregory C. Keating ["Keating Aff."], submitted herewith, at Tab 2 as Exhibit A).

21.     The Adecco contract memorializes USCO's consistent treatment of temporary workers as employees of the temporary staffing agency and as non-employees of USCO. (Keating Aff. at Exhibit A).

22.     For example, the Adecco contract specifically provides that temporary workers are Adecco employees and merely independent contractors of USCO. It also contains a provision requiring all temporary workers who are assigned to USCO tasks to sign written acknowledgements, appended to the Adecco contract, that they are Adecco employees and not USCO employees. (Id. at Exhibit A §4.1; see also Exhibit D to Adecco Contract).

23.     Further, the Adecco contract specifically requires that Adecco, as the employer of the temp workers, do the following with respect to its employment of temporary workers it may provide to USCO:

- check references, and screen and drug test workers who may work on temporary jobs at USCO;
- comply with state and federal rules and regulations (including those concerning immigration forms) regarding the temporary workers' employment at Adecco;
- develop an orientation plan for temporary workers regarding safety, absenteeism, tardiness, and other work procedures;
- provide on-site assistance (in the form of personnel and computer assistance) on any occasion where there are 75 temporary workers on-site (or where a monetary threshold is met);
- direct temporary workers to perform their job duties at USCO and communicate with temporary workers regarding their hire, duties, benefits, payroll, discipline and termination, as well as work-related injury issues that may arise;
- provide wages, benefits and compensation for its temp workers;
- provide replacement temporary workers to USCO if necessary;
- provide and maintain insurance for temporary workers, including workers compensation insurance;
- bond temp workers; and
- provide "point" offices for each USCO location to handle Adecco's responsibilities regarding the temp workers. (Id. at Exhibit A §1; see also Exhibit A to Adecco Contract).

24. The Fund Manager for Local 25 brings this suit to compel USCO to contribute to the fund for the few temporary workers used at the Franklin facility from December 31, 2000 going forward, and to recover contributions that USCO has not made for temporary workers used from January 1, 1997 through December 31, 2000.

25. Because temporary workers employed by the outside staffing agency are not members of the collective bargaining unit, they will receive no benefit should money be contributed to the Fund on their behalf. (See Article V, §1 of the Restated Agreement and Declaration of Trust, which is Exhibit 1 to the Deposition of Charles Langone ["Langone Dep."]. A true and accurate copy of the Restated Agreement and Declaration of Trust is attached to the Keating Aff., submitted herewith, as Exhibit B).

26. Moreover, should USCO be required to make contributions to the pension fund on behalf of these non-employee temporary workers, USCO may be forced to consider closing the struggling Franklin facility to stem the losses it is incurring by operating the facility. Cooke Aff. at ¶ 24.

B.  The Collective Bargaining Agreements.

27. USCO has entered into two collective bargaining agreements with Unions representing workers at its Franklin Facility over the relevant time period.

28. The first collective bargaining agreement is between USCO and the International Brotherhood of Teamsters, Chauffeurs, Warehouse Employees and Helpers Union, Local No. 829 and was effective over the period September 1, 1996 through August 31, 2001. (A true and accurate copy of the collective bargaining agreement between USCO and the International Brotherhood of Teamsters, Chauffeurs, Warehouse Employees and Helpers Union, Local No.

829, hereinafter "previous CBA," which is Exhibit 4 to the Langone Dep., is attached to the Keating Aff., submitted herewith, as Exhibit C).

29. The current collective bargaining agreement is between USCO and Local 25, and is effective September 1, 2001 through August 31, 2006. (A true and accurate copy of the collective bargaining agreement between USCO and Local 25, effective September 1, 2001 through August 31, 2006, hereinafter "current CBA," which is Exhibit 5 to the Langone Dep., is attached to the Keating Aff., submitted herewith, as Exhibit D).

30. Both the previous and the current CBA contain an identical provision requiring USCO to make payments to the fund for "each and every employee performing work within the scope of and/or covered by the collective bargaining agreement, whether such employee is a regular, probationary, temporary or casual employee, irrespective of his status as a member or non-member of the Local Union." (See Keating Aff., Exhibit C, Article VII; Exhibit D, Article 15.

31. In both the previous and current CBA, the Union agreed that it had/has jurisdiction over the Franklin "USCO operation and its Employees at" the Franklin facility. (Keating Aff., Exhibit D, Article 1; Exhibit C, Article 1. Nowhere in either the previous or the current CBA are temporary workers - - who are employed by temporary staffing agencies - - defined as USCO employees. (Id.)

32. The current CBA specifically differentiates between "Temporary Workers" and "Temporary Employees." Article 5 of the current CBA states that all "new [USCO] Employees shall be considered to be on a 'Temporary' or 'Probationary' basis for a period of thirty (30) working days" (before becoming USCO employees), and specifically states that such employees are covered by Article 15 of the CBA concerning the Company's obligation to make pension

contributions. (Keating Aff., <u>Exhibit D</u>, Article 5). This Article refers to newly-hired USCO employees completing their probationary period at the Company. (<u>Id.</u>).

33. Article 10 of the current CBA specifically addresses the use of Non-Employee temporary workers by USCO. (Keating Aff., <u>Exhibit D</u>, Article 10). That Article reflects an agreement between USCO and the Union to offer voluntary overtime to bargaining unit members based on the number of Non-Employee temps in the facility. (<u>Id.</u>). Article 10 refers to such temporary workers as "temps" or "workers," not as employees. (<u>Id.</u>). During the most recent collective bargaining negotiations in 2001, USCO's bargaining representative, Eric Peterson, ultimately agreed to the language "temporary workers" because it highlighted the important distinction between those individuals brought in on an as-needed basis through a temporary agency (temporary workers) versus those individuals temporarily employed on a probationary basis by USCO (temporary employees). (Affidavit of Eric N. Peterson, submitted herewith at Tab 3).

34. Unlike Article 5 in the current CBA, concerning new "Probationary" or "Temporary" employees of USCO, Article 10 of the current CBA makes no mention of the application of the Pension provision, Article 15, to temporary workers. (<u>Id.</u>).

35. Neither the current nor the previous CBA requires a contributing employer to make contributions to the fund for persons who are not employees of the employer. (Langone Dep., pp. 19-21, a true copy of which is attached to the Keating Aff., submitted herewith, as <u>Exhibit G</u>).

C. <u>The Pension Fund Documents</u>.

36. The Pension Fund's own governing documents speak exclusively about "Employees" of contributing Employers. For example, the Fund's "Mandatory Contract

Language for Pension Fund" contains language similar to the CBAs' pension provisions, calling for contributions to the Fund "for each and every employee, whether such employee is a regular, probationary, temporary or casual employee, irrespective of his status as a member or non-member of the Local Union, from the first hour of employment subject to this collective bargaining agreement . . . . ." (A true and accurate copy of the New England Teamsters & Trucking Industry Pension Fund Mandatory Contract Language for Pension Fund, which is Exhibit 3 to the Langone Dep., is attached to the Keating Aff., submitted herewith, as Exhibit E).

37. The Standard Participation Agreement does not require that contributing employers make contributions to the fund for employees of another company. (Keating Aff. at Exhibit G, Langone Dep. at 17-18).

38. The Restated Agreement and Declaration of Trust recites the following definition of Employee in Article I, Section 2: "An 'Employee' shall be any person covered by a collective bargaining agreement between an employer and a Local Union and any full time salaried employee of an employer as defined in Section 1, 2nd paragraph herein." (Keating Aff., Exhibit B).

39. The Restated Agreement and Declaration of Trust calls for a contributing employer to make contributions as provided in the operative collective bargaining agreement. (Id., at Article V, §1).

40. The Pension Plan Rules and Regulations also state in Section 1.18 (a) that an "'Employee' means a person who is an employee of an Employer and who is covered by a collective Bargaining Agreement requiring Employer contributions on his behalf." (A true and accurate copy of the New England Teamsters & Trucking Pension Plan Rules and Regulations,

which is Exhibit 2 to the Langone Dep., is attached to the Keating Aff., submitted herewith, as Exhibit F).

41. The Rules and Regulations call for contributions to be made according to the terms of the Collective Bargaining Agreement.[2] (Id., at §1.10).

42. Finally, Section 2.01 of the Plan Rules and Regulations, entitled "General" notes that "[t]his Pension Plan is intended primarily to provide retirement benefits for Employees of Contributing Employers . . . ." (Id.)

43. Nothing in the Pension Plan Rules and Regulations requires contributing employers like USCO to make contributions to the fund on behalf of employees of another company. (Keating Aff., Exhibit G, Langone Dep., p. 14).

Respectfully submitted,

USCO DISTRIBUTION SERVICES, INC.,
a/k/a USCO LOGISTICS SERVICES, INC.

By its attorneys,

_____
Gregory C. Keating (BBO # 564523)
Amy L. Nash (BBO # 647304)
LITTLER MENDELSON, P.C.
One International Place, Suite 2700
Boston, MA 02110
Telephone: (617) 378-6000

Dated: October 22, 2004

---

[2] As explained above, each of the operative CBAs in this matter call for USCO to make contributions to the fund on behalf of USCO employees. (See Exhibits A and B to the Keating Aff.).