UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2004 NOV -5  P  4: 26

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |  |
|---|---|---|
| CHARLES LANGONE, as FUND MANAGER of the NEW ENGLAND TEAMSTERS AND TRUCKING INDUSTRY PENSION FUND | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 04cv10041 PBS |
| USCO DISTRIBUTION SERVICES, INC., a/k/a USCO LOGISTICS SERVICES, INC. | ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Charles Langone, as Fund Manager of the New England Teamsters and Trucking Industry Pension Fund ("Fund"), submits this Memorandum in Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment.

Plaintiff maintains that USCO Distribution Services, Inc., a/k/a USCO Logistics Services, Inc. ("USCO"), is obligated, pursuant to its collective bargaining agreement with Teamsters Local 25 (and previously Teamsters Local 829), to make contributions to the Fund for "temporary employees" who work at USCO's Franklin, Massachusetts warehouse and who are supplied to USCO by an outside temporary staffing agency. Plaintiff contends that contributions are due based upon the clear and unambiguous language in the collective bargaining agreement; the Fund Trustees' authority to interpret the Fund's documents, including the Standard Participation Agreement; the fact that

USCO has previously made contributions for such temporary employees and attempted, unsuccessfully, to change the pension language in the last round of negotiations; and because the individuals in question constitute common law "employees" of USCO.

I.    The Collective Bargaining Agreement is Clear and Unambiguous.

The collective bargaining agreements between USCO and Teamsters Local 25 (and previously Local 829), clearly and unambiguously require USCO to make contributions for "temporary employees":

> . . . the Employer agrees to make payment to the New England Teamsters and Trucking Industry Pension Fund for *each and every* employee *performing work within the scope of* and/or covered by this collective bargaining agreement, whether such employee is a regular, probationary, *temporary* or causal employee, *irrespective of his status* as a member or *non-member of the Local Union* from the first hour of employment . . . (emphasis added) (Langone Aff., ¶ 17, Exhs. 6, 7).

First, it is undisputed that those employees supplied to USCO by Adecco and other temporary staffing agencies perform work "within the scope of" the collective bargaining agreement, and which is likewise performed by the bargaining unit employees. (Lazazzero Aff., ¶ 16; Rocha Aff., ¶ 11). Bargaining unit employees load and unload product, including "lumping" of unpalletized product. They also work on special projects such as ticketing and labeling product. (Cooke Aff., ¶ 16; Second Affidavit of Robert M. Rocha, ¶ 3). In short, there is no work performed by the temporary employees that is not or has not in the past also been performed by bargaining unit employees. Thus, it is clear that the work performed by the temporary employees is work "within the scope of the collective bargaining agreement."

Second, the pension article specifically requires contributions for "temporary employees". The provision states that contributions must be made for "each and every

employee", and that included within the scope of employees are "regular, probationary, *temporary*, [and] casual employee[s]." The only "temporary employees" at USCO are those supplied by an outside staffing agency. (Conti Aff., ¶ 2, Exh. 1, p. 3; Lazazzero Aff., ¶ 24).

USCO attempts to argue, however, that "temporary" employees and "probationary" employees are interchangeable terms. This argument must fail for several reasons. First, the parties have never previously used these terms interchangeably. (Second Affidavit of Arthur J. Lazazzero, ¶ 9). Second, USCO's citation to Article 5 of the current collective bargaining agreement in support of its argument fails because nowhere within Article 5 is there any reference to "temporary employees." Rather, the provision, titled "Probationary Period," states:

> All new employees shall be considered to be on a 'Temporary' or 'Probationary' *basis* for a period of thirty (30) working days. The probationary period for employees shall consist of thirty (30) consecutive working days of employment from the date of beginning employment, during which time the employees shall not acquire any seniority, they shall not be covered in any other way by the terms and conditions of this Agreement except that probationary employees will be subject to the language contained in the Pension Article.
> *Probationary employees* may be disciplined or discharged for any reason whatsoever at the exclusive discretion of the Employer without recourse to the grievance or arbitration provisions of this Agreement. It is agreed that the thirty (30) consecutive working days must be compiled within twelve (12) consecutive weeks. All new employees shall be advised of the foregoing arrangements at the time of their hiring. If still employed at the end of such period, the seniority of the employee shall be effective as of the beginning of employment and his name shall be added forthwith to the employees' seniority list and notice thereof shall be furnished by the Employer to the Union.
> A Permanent or Regular Employee is one who has successfully completed his/her Probationary period as detailed in this Article 5. (Langone Aff., ¶ 17, Exh. 7).

While Article 5 makes reference to a temporary "basis", at no point does the provision refer to the individuals described therein as "temporary employees". The provision is titled "Probationary Period", and only makes reference to "probationary

employees". Nowhere in the provision is there any indication that "temporary employee," as that term is used in Article 15, the pension provision, means an individual hired by USCO whom it intends to hire as a regular/permanent employee following the completion of a probationary period. Article 15 does not use the terms "temporary employee" and "probationary employee" interchangeably; rather, it lists them as separate, distinct classifications. The pension language does not read "probationary or temporary employee", or "probationary/temporary employee." Instead, it separates "temporary" from "probationary" employees as distinct classifications. Under the interpretation urged by USCO, the term "temporary employee" as used in Article 15 would be rendered meaningless. If probationary and temporary employees are the same, then it makes no sense for the two to be listed as separate classifications in Article 15.

In addition, the parties have never referred to probationary employees hired directly by USCO as "temporary employees." USCO, for the first time, raises this unsupported theory in a desperate attempt to avoid its obligations to make contributions for temporary employees obtained through Adecco and other temporary staffing agencies. Evidence that the parties did not interpret the term "temporary employees" to mean probationary employees is the fact that *on four separate occasions*, USCO made contributions to the Fund for "temporary employees" and "temps". (Langone Aff., ¶¶ 21-24, Exhs. 8, 9, 10, 11; Conti Aff., ¶ 2, Exh. 1, pp. 12-17). When asked during his deposition testimony to whom he was referring when he wrote "temps" on the remittance reports supplied to the Funds, USCO Distribution Center Manager Steven Cooke unhesitatingly stated that he was referring to *those employees supplied to USCO by a temporary staffing agency*. (Conti Aff., ¶ 2, Exh. 1, pp. 12-17). Cooke also admitted that

4

there are no other individuals at USCO's warehouse who are referred to as "temps" other than those individuals supplied by Adecco and other staffing agencies. (Conti Aff. ¶ 2, Exh. 1, p. 31).

USCO's reference to Article 10, "Use of Temporary Workers and Overtime", in support of its position that the phrase "temporary employees" does not refer to those individuals supplied by Adecco, is equally unavailing. USCO argues that Article 10, which makes reference to "temporary workers", is further evidence that "temporary employees", as that term is used in the pension provision, means "probationary employees", and does not refer to those individuals supplied by an outside staffing agency.

USCO's argument is untenable for several reasons. First, contrary to the implication made in Eric Peterson's affidavit that he "agreed" to the "temporary workers" language in Article 10 so as to distinguish between those individuals supplied by a temporary agency and probationary employees (under the above-described USCO theory that "temporary employees" and "probationary employees" are one in the same), the parties never had any discussion as to this alleged distinction. (Second Affidavit of Lazazzero, ¶¶ 6-9). While Mr. Peterson may have thought about this distinction privately, it was never an issue during negotiations. Article 10 was added for one reason and one reason only- to provide overtime opportunities to bargaining unit employees based upon the number of temporary employees USCO uses from an outside agency. Critically, Mr. Peterson and Mr. Cooke admitted that there was no discussion between the parties in the last round of negotiations concerning the meaning of the phrase "temporary employees" as that term is used in Article 15 of the collective bargaining agreement.

(Second Affidavit of Jonathan M. Conti, ¶ 3, Exh. B, pp. 16-17; First Conti. Aff., ¶ 2, Exh. 1, p. 32).

Furthermore, the fact that Article 10 does not reference pension contributions for the "temporary workers" is irrelevant. There was no reason to add pension language in Article 10, because it dealt solely with overtime opportunities for bargaining unit employees, and because the pension language already existed in Article 15, the same language pursuant to which USCO made contributions to the Fund on four separate occasions. (Langone Aff., ¶¶ 21-24, Exhs. 8, 9, 10, 11).

USCO cannot claim that Article 10 changed the parties' interpretation of the language in Article 15 by adding language to an unrelated provision that addressed overtime opportunities for bargaining unit employees. It is undisputed that the pension language as found in the 1996-2001 collective bargaining agreement, and pursuant to which USCO made contributions on four separate occasions, remains unchanged in the current agreement. (Lazazzero Aff., ¶ 4; Langone Aff., ¶ 17, Exhs. 6, 7). In fact, Eric Peterson proposed during negotiations for the current agreement that the parties make changes to the pension provision so that USCO would no longer have to make contributions for temporary employees supplied by an outside temporary staffing agency. Arthur Lazazzero told Peterson that the Union would not negotiate any changes to the pension language. (Lazazzero Aff., ¶ 20; Second Lazazzero Aff., ¶ 3). This, coupled with USCO's past contributions for temporary employees, constitutes an acknowledgement by USCO that the pension language requires contributions for temporary employees supplied by outside staffing agencies.

Thus, USCO was unable to achieve the changes it sought to the pension language during the latest round of negotiations. It cannot now achieve those changes by asserting that an unrelated provision regarding overtime for bargaining unit employees alters the pension language or the parties' understanding of that language. The pension language in Article 15 remains unchanged from the language found in the 1996-2001 agreement that required contributions for "temporary employees" and for which USCO made contributions to the Fund on four previous occasions.

Lastly, Article 15 clearly states that "This Pension Article shall supersede and prevail over any other inconsistent provisions or articles contained within this agreement." Thus, even assuming, *arguendo*, that other provisions in the collective bargaining agreement conflict with the pension provision, the pension provision language shall control. See: *Central Pennsylvania Teamsters Pension Fund v. Power Packaging, Inc.*, 2004 U.S. Dist. LEXIS 9914, 33 Employee Benefits Cas. (BNA) 1432 (May 27, 2004) (The pension section of the agreement "cannot be limited by other language found in the CBAs."). Since the pension provision makes temporary employees and probationary employees separate employee classifications, they must be treated as such for pension purposes, and USCO's new theory must therefore be rejected.

II.     The Trust Documents Require Contributions for Temporary Employees Supplied by Adecco and Other Temporary Staffing Agencies.

The Fund's Trust documents, specifically the Restated Agreement and Declaration of Trust ("Trust Agreement"), and the Complete Rules and Regulations for the New England Teamsters & Trucking Industry Pension Plan ("Plan Rules"), support the Fund's argument that contributions must be made for those temporary employees supplied to USCO by Adecco and other agencies. (Langone Aff., ¶¶ 3, 4, Exhs. 1, 2).

USCO correctly notes that Article 1, Section 2 of the Trust Agreement, and Section 1.18 of the Plan Rules, define an "employee" as "any person covered by a collective bargaining agreement between an Employer and a Local Union . . ." However, the phrase "any person" clearly encompasses the temporary employees supplied to USCO that are in dispute here. Second, these temporary employees are "covered" by the collective bargaining agreement between USCO and Local 25 (and previously Local 829) in the sense that the pension provision requires pension contributions for those temporary employees performing work within the scope of the collective bargaining agreement.

Third, the Standard Participation Agreement, which is attached to the Restated Agreement and Declaration of Trust as "Appendix A", was signed by USCO, and whose language is contained in the parties' collective bargaining agreement, requires contributions for "each and every employee performing work within the scope of and/or covered by the collective bargaining agreement," including "temporary" employees. (Langone Aff., ¶ 12, Exh. 3). Thus, the Standard Participation Agreement, even assuming the interpretation urged by USCO regarding the phrase "covered by the collective bargaining agreement," expands USCO's contribution obligations to include employees "performing work within the scope of" the agreement. Thus, USCO cannot argue that pursuant to the Fund's Trust documents, contributions do not have to be made for the temporary employees in question because they are not "covered" by the collective bargaining agreement.

Lastly, the Standard Participation Agreement states that "in the event of any conflict between these provisions and other provisions of such collective bargaining agreement, the terms and conditions set forth below shall prevail with respect to pension

contributions and coverage." (Langone Aff., ¶ 12, Exh. 3). Thus, as also provided for in the pension provision of the collective bargaining agreement, the pension language found in the Standard Participation Agreement and Article 15 of the current collective bargaining agreement supersedes any other potentially conflicting language.

III.    The Individuals Supplied by the Temporary Staffing Agency are "Employees" of USCO.

The issue here is whether the individuals supplied by Adecco and other staffing agencies are "temporary employees" as that term is used in the pension provision of the 1996-2001 and 2001-2006 collective bargaining agreements. As noted previously, there is no other classification of employee at USCO that has ever been referred to as "temporary employees" other than those individuals supplied to USCO by Adecco and other outside staffing agencies. In addition, the parties have previously interpreted the pension language in the collective bargaining agreement as requiring contributions for such "temporary employees" as evidenced by past contributions made to the Fund.

Nonetheless, it is also clear that the individuals in question are common law "employees" of USCO. Again assuming, *arguendo*, that the collective bargaining agreement is ambiguous in terms of whether the individuals supplied to USCO by temporary staffing agencies such as Adecco are "employees" for whose hours contributions must be made, the Court should look to the common law test for determining whether an individual is an employee:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method

of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Nationwide Mutual Insurance Company v. Darden,* 503 U.S. 318, 323 (1992), quoting *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 751-752 (1989).

While no single factor is dispositive, "the greatest emphasis should be placed on the first factor- that is, on the extent to which the hiring party controls the 'manner and means' by which the worker completes his or her assigned tasks." *Eisenberg v. Advance Relocation & Storage, Inc.,* 237 F.3d 111, 114 (2nd Cir. 2000). The reason for this is that under the common law of agency,

> 'An employer- employee relationship exists if the purported employer controls or has the right to control both the result to be accomplished and the manner and means by which the purported employee brings about that result.'
> *Id.,* quoting *Hilton Int'l Co. v. NLRB,* 690 F.2d 318, 320 (2nd Cir. 1982).

Furthermore, when, as is the case here, a court faces the question of whether an individual supplied to an employer by a temporary staffing agency is an "employee" of that employer, a unique problem is presented which requires the court to examine the entire working relationship between the temporary agency and the employer in relation to one another, and in relation to the individual worker. *Richardson v. Century Products, Inc.,* 163 F.Supp.2d 771, 775 (N.D. Ohio 2001).

In situations involving a temporary employment agency supplying employees to a client employer, courts have used the "loaned servant doctrine" for determining whether an individual is an "employee" of the client employer, as it is possible for one to be an employee of both entities simultaneously. *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 611 F.Supp. 344, 347 n.11 (S.D.N.Y. 1984). The "loaned servant doctrine"

10

provides that an employee directed or permitted to perform services for another 'special employer' may become the special employer's employee while performing those services. *Mullis v. Mechanics and Farmers Bank,* 994 F.Supp. 680, 685 (D.N.C. 1997). "Where the special employer controls the means and manner of the temporary employee's work, the temporary employee is considered an employee of both the temporary agency and the special employer." *Id.* "The extent of the employer's right to control the 'means and manner' of the worker's performance is the most important factor." *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 611 F.Supp. at 348. The key factor in loaned servant cases is the "special" employer's exclusive right to supervise the employee's work during the period of temporary service. *Id.*

In *Amarnare,* a Title VII case, Merrill Lynch claimed that the plaintiff was not its employee, but rather was only an employee of Mature Temps, an employment agency that provided temporary personnel to businesses such as Merrill Lynch. The plaintiff worked for the company for two weeks, during which time Merrill Lynch exercised complete control over the plaintiff's work assignments, the means and manner of her performance, and her hours of employment. *Id.* at 348. Merrill Lynch had the right to discharge the plaintiff and to request a replacement from Mature Temps if it found the plaintiff's services to be unsatisfactory. *Id.* The court therefore concluded under the loaned servant doctrine that the plaintiff was an "employee" of Merrill Lynch.

Similarly, in *Richardson v. Century Products, Inc.,* 163 F.Supp.2d 771 (N.D.Ohio 2001), a Title VII case, Century had a contract with Manpower, a temporary staffing agency, pursuant to which Manpower supplied temporary employees to Century. The plaintiff had been hired through Manpower and supplied to Century, where she worked

from August 15 to August 29, 1999. *Id.* at 773. Century had a contract with Manpower, pursuant to which it would contact Manpower if it needed a position filled. Century would describe the position and the necessary qualifications, and Manpower would then review its files to determine acceptable employees to provide to Century. *Id.* at 775. Century determined the destination or area for which it needed the temporary employee. *Id.*

In examining the relationship between Century and Manpower, and each company in relation to the plaintiff employee, the court noted that it was Century that determined the department or area for which it needed a temporary employee, and while Manpower told the employee when to report for work and how long the assignment would run, these decisions were originally made by Century. *Id.* at 775. The court also found the fact that Manpower was responsible for paying the employee's wages and withholding taxes to be unavailing, since Century paid Manpower enough to cover the employee's wage and the fee charged by Manpower. *Id.* The court therefore concluded that "the fact that Century determined the position that needed filled and tells Manpower the hours an individual would be required to work permits an inference that [the plaintiff] was an employee of both Manpower and Century." *Id.* at 775-776. See also: *Williams v. Grimes Aerospace Company,* 988 F.Supp. 925 (D.S.C. 1997) (Plaintiff found to be employee of Grimes even though she had been supplied by temporary agency where the courts looked at all of the circumstances surrounding the work relationship, with the most emphasis placed on the extent of the employer's right to control the manner and means of the employee's performance).

In *Shaw v. Thrift Drug, Inc.*, 1999 U.S. Dist. LEXIS 16895 (E.D.Pa.) (Nov. 2, 1999), the plaintiff claimed Thrift was his employer for workers' compensation purposes. The plaintiff was placed at Thrift Drug's warehouse by American Staffing Resources, a provider of temporary employees. The plaintiff applied for employment with American, and American assigned him to Thrift Drug, only informing him that he would be loading trucks there. *Id.* at [*7]. American did not train the plaintiff in any way prior to referring him to Thrift. *Id.*

American and Thrift were parties to an agreement pursuant to which American provided employees to Thrift. The agreement stated that these individuals were employees of American and were not to be deemed to be Thrift's employees. *Id.* American was also required under the agreement to provide worker's compensation insurance to the plaintiff. When Thrift needed additional employees, it would call American and provide the requirements for the job it needed filled. *Id.* at [*9].

When the plaintiff arrived at Thrift, a Thrift employee took him to the loading dock and instructed him on how to load and unload the truck. *Id.* at [*8]. A Thrift management employee supervised the plaintiff and decided which activities the plaintiff would be performing. *Id.* This Thrift supervisor also had the right to terminate his employment by sending the plaintiff home and calling American to tell it that the plaintiff was no longer needed. *Id.* at [*9-10].

The court, in holding that the plaintiff was an "employee" of Thrift, found that the evidence showed that Thrift determined the type of work to be performed; dictated the manner in which the plaintiff's work was to be performed; supervised the plaintiff; set the plaintiff's work schedule; had control over the plaintiff's duties and responsibilities;

directed the plaintiff as to the type of work to be performed (subject to the limitations that he was to perform only as a forklift operator and as prescribed by American); and directed the manner in which the plaintiff performed his job. *Id.* at [*7]. Lastly, the court held that American's provision of benefits, wages and insurance on the plaintiff's behalf was not dispositive. *Id.* at [*10].

Another instructive case is *Watson v. Adecco Employment Services, Inc.*, 252 F.Supp.2d 1347 (M.D.Fla. 2003), a case involving the same national temporary agency that currently services USCO, in which the court ruled that the temporary employment agency was not the plaintiff's employer. The plaintiffs sought to bring a lawsuit against Adecco for alleged Title VII violations.

Adecco had a contract with a School Board, pursuant to which the School Board would request temporary employees from Adecco. The School Board requested employees to work as food line servers for an undetermined period of time, and Adecco supplied a group of employees which included the plaintiffs. *Id.* at 1348. Once at the school, the School Board's cafeteria manager trained the plaintiff employees on their job assignments and supervised them. Adecco issued the paychecks and withheld the taxes and social security. *Id.*

The court, applying common law agency principles, found that Adecco exercised no control over the plaintiffs' responsibilities or duties once they were on assignment. Since the School Board trained and supervised the plaintiffs and dictated their work uniform, the plaintiffs reported to the School Board and not Adecco on a daily basis, and

once referred, Adecco did not control the plaintiffs' assignments, Adecco was found not

to be an employer of the plaintiff.[1]  *Id.* at 1356.

---

[1]      While the scenario in *Watson* was slightly different than the one present here, in that in that case the question was whether Adecco was an employer of the plaintiff employee, the same principles and legal analysis apply here in analyzing the interrelationship between Adecco, USCO, and the temporary employees.

In contrast, the cases sited by Defendant USCO in its Memorandum in Support of its Motion for Summary Judgment are distinguishable on factual, legal, and/or relevancy grounds. In *Camacho v. Puerto Rico Ports Authority,* 369 F.3d 570 (1st Cir. 2004), the plaintiff sought to hold the Port Authority as his employer when in reality, as the Court ruled, it was strictly a licensing and regulatory agency. *Id.* at 577. The Port Authority had no control over the pilots' activities; the pilots were highly skilled entrepreneurs who provided their own training and tools, and set their own schedules and chose their own routes. Similarly, *Albert-Velez v. Corporacion de Puerto Rico Para La Difusion Publica,* 361 F.3d 1 (1st Cir. 2004), is likewise distinguishable, as the plaintiff, a television actress, held a skilled position requiring talent and training not available on the job. *Id.* at 7. The plaintiff provided her own tools and instrumentalities needed to complete the job, and her compensation was not based on the time elapsed.

The Defendant's citation to *Boutilier v. John Alden Life Insurance Company,* 2000 U.S. Dist. LEXIS 17243 (D. Mass. 2000), is also misplaced considering that the individual who claimed to be an employee worked for his parents' business; controlled his own work and work schedule; had complete discretion over when and how long he worked; supplied his own tools; and paid his own business expenses.

While *Redd v. Summers,* 232 F.3d 933 (D.C.Cir. 2000), involved an individual supplied by a temporary agency, the agency was responsible for training the plaintiff tour guides, and the Treasury Department Bureau to which she was supplied had no control over the plaintiff's work except for one short period of time. The case of *Dunn v. Uniroyal Chemical Company, Inc.,* 192 F.Supp.2d 557 (M.D.La. 2001), provides no insight here, either, since the court engaged in virtually no analysis of the common law employee test, instead simply concluding that since Uniroyal had a staffing contract with Lofton, and Lofton had an employment contract with the plaintiff, the plaintiff could not be an employee of Uniroyal. *Id.* at 560.

Defendant's citation to *Pfohl v. Farmers Insurance Group,* 2004 U.S. Dist. LEXIS 6447 (C.D.Ca.) (March 1, 2004), is not instructive, since the court relied on a very limited test for determining whether Farmers was the joint employer of the plaintiff. The court focused on only four limited factors: whether the alleged employer (1) had the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of payment; (3) determined the rate and method of payment; and (4) maintained employment records.  This is not the detailed test employed by the Supreme Court in *Nationwide Mutual Insurance Company v. Darden,* 503 U.S. 318, 323 (1992), or *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 751-752 (1989), or by the First Circuit in *Speen v. Crown Clothing Corporation,* 102 F.3d 625, 631, 634 (1st Cir. 1996). Nor is there any reference to the "loaned servant doctrine" noted above.

Lastly, *Labor Relations Division of Construction Industries of Massachusetts, Inc. v. Teamsters Local 379,* 156 F.3d 13 (1st Cir. 1998), offers no guidance, since that case involved the question of whether truck owner-operators were employees entitled to fringe benefits pursuant to a project labor agreement. The owner-operators bore the cost of owning and insuring their own trucks, and any fuel, repairs, or tax expenses stemming from the operation of the vehicle were borne by the plaintiffs. *Id.* at 20. In addition, the evidence showed that the owner-operators often performed their services for more than one employer during the course of the work day; sometimes sent their friends and relatives to drive the trucks in their place; scheduled their own rest breaks; and performed services on whatever day they chose. *Id.* at 21. Clearly, these owner-operators bear no resemblance whatsoever to the warehouse temporary employees supplied by Adecco and other temporary agencies.

When one examines the written agreement between USCO and Adecco, as well as the affidavits of Robert Rocha and Steven Cooke, it is clear that the employees supplied by Adecco to USCO, and those employees previously supplied by other staffing agencies, are "employees" of USCO based upon the degree of control that USCO has over the methods and means of their production and terms and conditions of their employment.

As noted in Plaintiff's initial Memorandum in Support of its Motion for Summary Judgment, the following factors support a finding of "employee" status:

- Upon reporting to work at USCO, USCO supervisors and employees train the temporary employees on how to complete the work and the tasks expected of them;
- USCO supervisors advise the temporary employees as to USCO's procedures and rules, to which the temporary employees are subject;
- USCO supervisors decide which assignments and projects the temporary employees are to perform, and for how long;
- Supervisors have the authority to, and have, in the past, disciplined temporary employees, such as sending temporary employees home for the day;
- There are no Adecco supervisors on site;
- Temporary employees work side-by-side with the bargaining unit employees, performing many of the same tasks as those performed by bargaining unit members;
- The temporary employees work on-site at USCO's warehouse performing work such as unloading trucks and labeling and ticketing merchandise, which constitutes the type of warehouse work that is the primary business of USCO;
- USCO provides the temporary employees with all the tools and equipment necessary to complete their assignments;
- The work does not require prior special training or pre-existing specialized skills; and
- USCO retains temporary employees for as long as it desires.

In addition, the staffing agreement between USCO and Adecco spells out in the most definitive of terms that USCO controls the terms and working conditions of the temporary employees, and plays the primary role in the manner and means in which the temporary employees complete their work. For example, the agreement provides that:

- temporary employees are to perform their duties "under the supervision and control of USCO's designated supervisors, in accordance with USCO's directions and instructions." (Section 1.4)
- Said temporary employees are required to comply with USCO's "rules, regulations, and procedures." (Section 1.4)
- USCO is required to "supervise, direct and control the day-to-day work and/or tasks performed" by the temporary employees while at USCO, and must furnish the temporary employees with all "tools and other materials, including protective devices, safety glasses, gloves, instruments and/or other materials required". (Section 1.11)
- USCO "shall upon its review, approve time records submitted by [the temporary employees] and shall retain copies of such time records for a period of 3 years". (Section 1.10)
- "USCO may terminate or change any assignment for any reason," and at USCO's request, Adecco shall "promptly replace [an] unsatisfactory employee with another." (Section 1.6)
- Adecco shall immediately remove any temporary employee from assignment to USCO "for any reason at USCO's request." (Section 1.5) (Conti Aff. ¶ 3, Exh. 2).

Furthermore, while Adecco pays the temporary employees directly, USCO, pursuant to the agreement, pays Adecco a fee for each employee that not only covers the employee's wages, but also includes a built in "markup" fee for each employee in return for Adecco providing USCO with the temporary employee. (Conti Aff., ¶ 3, Exh. 3, Exhibit B-1, part of the USCO-Adecco staffing agreement). Thus, it cannot be said that USCO does not pay the employees. See: *Richardson v. Century Products, Inc.,* 163 F.Supp.2d 771, 775 (N.D.Ohio 2001), *infra.* In addition, while Adecco insures the temporary employees, USCO is listed as the "Alternate Employer" on the insurance policies according to the staffing agreement. (Conti Aff. ¶ 3, Exh. 2, Section 8.5).

While USCO claims that it has "no control" over which temporary employees it receives from Adecco, this is misleading in that Adecco supplies employees to USCO based upon the job descriptions and type of work USCO describes to Adecco. The employees supplied therefore meet the qualifications and requirements as specified by

USCO, pursuant to Section 1.1 of the USCO-Adecco staffing agreement. Steven Cooke stated in his deposition that when USCO needs temporary employees, either he or another supervisor calls Adecco and requests a certain number of temporary employees for a certain time and Adecco then supplies the employees based upon the type of work described by Mr. Cooke or other supervisors. (Second Conti Aff., ¶ 2, Exh. A, pp. 18-21).

Similarly, USCO's bald statement that it has no authority to discharge a temporary employee is likewise a distortion of the facts. USCO has complete and utter authority to remove a temporary employee from its projects. (Conti Aff., ¶ 3, Exh. 2, Section 1.5 of USCO-Adecco staffing agreement). Steven Cooke stated that in addition to himself, supervisors Bill Glover and John Pina also have the authority to discipline temporary employees. (Rocha Aff., ¶ 13; Conti Aff., ¶ 2, Exh. 1, p. 29). The fact that USCO informs Adecco that it no longer wants an employee's services and that Adecco must respect these wishes (Conti Aff. ¶ 3, Exh. 2, Section 1.5 of staffing agreement), constitutes the power to effectively discharge that employee. For USCO's purposes, it and it alone, determines whether an individual will continue to work at USCO.

USCO also claims that Adecco "schedules" the temporary employees, but it is USCO that determines the hours that the temporary employees work. USCO cannot credibly argue that Adecco sets the shift hours that the temporary employees work at USCO. The temporary employees work a 10:00 a.m. to 4:00 p.m. shift that overlaps with the hours worked by the bargaining unit employees based upon USCO's, not Adecco's, business needs. (Conti Aff., ¶ 2, Exh. 1). Section 1.3 of the USCO-Adecco staffing agreement states that with respect to scheduling, Adecco "shall schedule Provider

18

employees to work in coordination with the business needs of USCO, which shall be communicated to [Adecco] by USCO." (Conti Aff., ¶ 3, Exh. 2).

In addition, the fact that the agreement between USCO and Adecco states that "the parties agree that all Provider employees who perform services pursuant to [the] Agreement are employees of [Adecco] and [are] not to be considered employees of USCO except as required by law," is not dispositive as to whether the temporary employees are "employees" pursuant to which USCO must make contributions to the Fund.   Clearly, the Fund has never agreed that these temporary employees are not "employees" of USCO for pension contribution purposes under the collective bargaining agreement, or pursuant to the Standard Participation Agreement.   Such self-serving language added by USCO and/or Adecco is not binding on the Fund.  Furthermore, as noted, *infra*, in *Shaw v. Thrift Drug, Inc.*, the court found the plaintiff employee supplied by a temporary staffing agency to be an employee of Thrift even where the staffing agreement provided that temporary employees supplied by the staffing agency were employees of the agency, and not Thrift.  1999 U.S. Dist. LEXIS 16895, [*7] (E.D. Pa.) (Nov. 2, 1999).

Although USCO claims that the temporary employees "do not remain at USCO's facility for as long as 30 days," this statement is also misleading.  Article III of the 1996-2001 agreement and Article 5 of the 2001-2006 agreement (Probationary Period), provide that an employee who works thirty consecutive *working* days becomes a regular bargaining unit employee and a member of the Union.  USCO can and has in the past simply avoided triggering this provision by providing a temporary employee with a day off so that he does not work thirty consecutive *working* days, while at the same time still

19

employing him for several months as a temporary employee. (Rocha Aff., ¶ 15; Second Rocha Aff., ¶ 6). Thus, the tenure of the temporary employees' time with USCO is not as short as USCO claims. Had USCO not provided incomplete records regarding temporary employees pursuant to the audit performed by the Fund's auditor in 2000, this would be even more apparent. (Langone Aff., ¶ 15, Exh. 4).

Thus, based upon the common law factors, in combination with the loaned servant doctrine, it is clear that the temporary employees in question are "employees" of USCO, and, therefore, pursuant to Article 15 of the collective bargaining agreement, USCO must make contributions to the Fund based upon the hours these temporary employees work at USCO's Forge Park facility in Franklin, Massachusetts.

IV.    Conclusion

As the collective bargaining agreement clearly and unambiguously requires USCO to make contributions to the Plaintiff for temporary employees, the Court should grant the Plaintiff's Motion for Partial Summary Judgment, deny Defendant's Cross Motion for Summary Judgment, and find that USCO is required to make contributions for temporary employees supplied by an outside staffing agency.

Dated: November 5, 2004                    Respectfully submitted

                                           For the Plaintiff
                                           By His Attorneys


                                           _____
                                           Catherine M. Campbell (BBO #549397)
                                           Jonathan M. Conti (BBO # 657163)
                                           FEINBERG, CAMPBELL & ZACK, P.C.
                                           177 Milk Street
                                           Boston, MA 02109
                                           (617) 338-1976

## CERTIFICATE OF SERVICE

I, Jonathan M. Conti, hereby certify that I caused a copy of the foregoing to be mailed this date by certified mail, return receipt requested, to Gregory C. Keating, Esq., Littler Mendelson, P.C., One International Place, Suite 2700, Boston, MA 02110.

Date: November 5, 2004

Jonathan M. Conti

21