UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHARLES LANGONE, as FUND MANAGER of the NEW ENGLAND TEAMSTERS AND TRUCKING INDUSTRY PENSION FUND,

Plaintiff,

v.

USCO DISTRIBUTION SERVICES, INC., a/k/a USCO LOGISTICS SERVICES, INC.,

Defendant.

CIVIL ACTION NO. 04-10041-PBS

**MEMORANDUM AND ORDER**

September 16, 2005

Saris, U.S.D.J.

**I. INTRODUCTION**

Plaintiff Charles Langone, as Fund Manager of the New England Teamsters and Trucking Industry Pension Fund ("Fund"), alleges that defendant USCO Distribution Services, Inc. ("USCO") failed to make pension fund contributions for its temporary employees as required by collective bargaining agreements, in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1145 (2000).[1] USCO disagrees that the

[1] The complaint alleges that defendant violated the collective bargaining agreement ("CBA") in effect between defendant and Local 829 between September 1, 1996 and August 31, 2001 (Count I); that the payroll records provided by USCO in response to the audit conducted on April 5, 2001 were not complete (Count II); that defendant violated the CBA with Local No. 25 with effective dates of September 1, 2001 to August 31, 2006 (Count III). Plaintiff seeks monetary damages, injunctive relief, liquidated damages, interest, attorneys fees, and costs.

collective bargaining agreements ("CBAs") require it to make contributions to the Fund on behalf of temporary workers supplied by staffing agencies to its Franklin, Massachusetts facility. The parties have cross-moved for summary judgment. After hearing, the Court **ALLOWS** plaintiff's motion for partial summary judgment on Counts I and III; and **DENIES** defendant's motion.

## II. FACTS

The record supports the following facts, which are undisputed, except where stated:

### A. The Parties

USCO provides logistical, freight, and warehousing services at its facility in Franklin, Massachusetts. It receives merchandise, stores it, and then ships it to other locations. USCO was a party to a CBA with the International Brotherhood of Teamsters, Chauffeurs, Warehouse Employees and Helpers Union, Local Union 829 ("Local 829") with effective dates of September 1, 1996 through August 31, 2001 ("1996-2001 CBA"). On March 8, 2000, Local 829 merged with Teamsters Local 25, which then entered into a CBA with USCO with effective dates of September 1, 2001 through August 31, 2006 ("2001-2006 CBA").

### B. Governing Plan Documents

The New England Teamsters and Trucking Industry Pension Fund ("the Fund") is a multiemployer pension plan governed by ERISA. It was established to receive contributions and provide pension

benefits to eligible employees pursuant to a Restated Agreement and Declaration of Trust ("Trust Agreement"). The Fund is administered by an eight-member board of trustees, four representing local Teamster unions and four representing employers. Employers make contributions on behalf of employees for each hour of employment "covered" by the CBA.

The Trust Agreement gives the trustees considerable discretion in construing its terms and the terms of the plan. Specifically, Article IV § 2 of the Trust Agreement provides that the trustees of the Fund shall have the power to

> construe, with discretionary authority, provisions of this Trust Agreement, or the Plan adopted hereunder, and the terms thereof, and any construction adopted by the Trustees in good faith shall be binding upon the Unions, the Employers and the Employees . . . .

Article IV § 3(j) further provides that the trustees have the authority to

> reconcile, determine, interpret and construe, with discretionary authority, any question or dispute arising in connection with definitions of terms, rights, status or classification of employees, or any other dispute or claim arising under the Plan . . . .

The Trust Agreement also contains a Standard Participation Agreement, which USCO signed as "Mandatory Contract Language for Pension Fund," that provides:

> (a) This Pension Article shall supersede and prevail over any other inconsistent provisions or articles contained within this agreement or the parties' collective bargaining agreement.
>
> (b) Commencing with the [first] day of [September] [1996 or 2001], and for the duration of the current

> collective bargaining agreement between Local Union [#829 or #25] and the Employer, and any renewals or extensions thereof, **the Employer agrees to make payments to the New England Teamsters and Trucking Industry Pension Fund for each and every employee performing work within the scope of and/or covered by this collective bargaining agreement, whether such employee is a regular, probationary, temporary or casual employee,** irrespective of his status as a member or non-member of the Local Union, from the first hour of employment subject to this collective bargaining agreement . . . .

(Id. (emphasis added).) Article VII of the 1996-2001 CBA and Article 15 of the 2001-2006 CBA both contain this mandatory language, and USCO agreed to the language.

The second article of both CBAs states that the agreements cover "all Warehouse Employees below the grade of Supervisory Foreman, with the exception of Office Help" at USCO's facility in Franklin. Article 5 of the 2001-2006 CBA and Article III of the 1996-2001 CBA both state that all "new Employees shall be considered to be on a 'Temporary' or 'Probationary' basis for a period of thirty (30) working days" and that completion of thirty consecutive working days qualifies one as a regular employee and a member of the union.

**C. The Audit**

On April 5, 2001, the Fund's Auditor, Tom McMorrow, conducted an audit of USCO contributions to the pension plan for 1997 through 2000. The first part of the audit determined that USCO owed the Fund $14,264.67 (plus interest of $95.10 per month) in contributions for January 1, 1997 through March 31, 2000. The

second part determined that USCO owed the Fund $5,219.39 (plus interest of $39.42 per month) for April 1, 2000 through December 31, 2000. The calculations included contributions for hours worked by individuals supplied by temporary staffing agencies. Because the parties spar over the nomenclature of these individuals -- "temporary workers" versus "temporary employees" -- this opinion will refer to them as "temps." McMorrow, who is now deceased, noted that the payroll records were incomplete because many of the records of the temps were missing or could not be identified. The estimated deficiency was $3,000.00.

**D. Most Recent CBA Negotiations**

During the most recent negotiations for the 2001-2006 CBA, USCO's chief negotiator, Eric Peterson, requested to change the language in the pension provision to eliminate the requirement that USCO make contributions on behalf of temps. The Union did not agree, and the pension language remained unchanged from the previous 1996-2001 CBA.

However, the parties added language in Article 10, entitled "Use of Temporary Workers and Overtime." Article 10 provides that if USCO uses temps on any given day, it will offer a certain amount of voluntary overtime to the bargaining unit members based upon the number of temps used in a particular day. For example, it provides:

> For Temp usage of 15[] or more workers in any given day, management will offer 2 hours of voluntary overtime (or the number of hours

> remaining from the scheduled end of the employee's shift until the building closes, whichever is less) to the same number of bargaining unit members of the facility.

While Article 10 uses the terms "temporary workers" and "temps," it does not mention pension contributions. Peterson asserts that he agreed to the language "temporary workers" because it highlighted the important distinction between those individuals brought in on an as-needed basis through a temporary agency ("temporary workers") and those individuals temporarily employed on a probationary basis by USCO ("temporary employees"). Conversely, the Fund contends that during these negotiations there was no discussion regarding any distinction between "temporary workers" and "temporary employees."

**E. <u>Temps</u>**

In 2002 USCO entered into a national contract with Adecco North America, LLC ("Adecco") for the provision of temporary work assistance. USCO also uses other staffing agencies.

Pursuant to § 1.1 of the agreement between USCO and Adecco, entitled "Agreement to Furnish Employees," Adecco supplies temps to USCO. Section 1.9 requires all temps assigned to USCO tasks to sign written acknowledgments that they are Adecco employees and not USCO employees. However, § 8.5(b) of the same agreement provides that Adecco shall name USCO as an "Alternate Employer" under the insurance policies it retains for its temps.

In addition § 1.4 states that the temps supplied by Adecco

work under the supervision and control of USCO's supervisors and must comply with USCO's rules, regulations, policies, and procedures. Section 1.11(c) requires USCO to provide all necessary tools and equipment to the temporary employees. Sections 1.5 and 1.10, respectively, provide USCO with authority to remove the temps and to review and approve their time records.

Steven Cooke and William Glover are the two main warehouse supervisors. They supervise the bargaining unit employees and also all people provided by temporary staffing agencies. When a temporary person first reports to work at USCO, USCO's supervisors or management personnel conduct safety training, review the manner in which the work is to be completed, and explain USCO's work rules and policies. Mr. Cooke and Mr. Glover make the decisions as to where to assign the temps in the warehouse and determine the duration of their tasks or projects. Generally, there are no supervisors from the temporary employment agency on-site at the USCO warehouse. Supervisors Cooke and Glover discipline temporary persons and have in the past sent them home for disciplinary reasons. The temps and the bargaining unit employees interact with one another and work side by side performing the same USCO warehouse work. USCO does not directly hire or fire the temps, but Adecco must remove temps if requested by USCO for any reason. USCO does not directly pay the temps, pay payroll or social security taxes associated with the employment of the temps, or provide them with insurance or other benefits.

USCO at times has employed the same individual temps for up to two consecutive working months. However, to avoid triggering Article III of the 1996-2001 CBA or Article 5 of the 2001-2006 CBA, whereby a temp who works thirty consecutive days becomes a regular bargaining unit employee and a member of the union, USCO has made sure not to allow a temp to work thirty consecutive days at the warehouse.

To date, USCO has refused to make any payments allegedly due under the audit because it has taken the position that it is not responsible for making contributions to the Fund on behalf of temps. It is the Fund's contention that temps included in the audit are employees performing work within the scope of and covered by the collective bargaining agreement.

**F. <u>Course of Performance</u>**

Between April 14, 2000 and January 2, 2001, USCO made contributions on four occasions for hours worked by temps. According to USCO, these contributions were submitted because a new executive who had recently joined the company erroneously believed that USCO should make contributions on behalf of workers from temporary staffing agencies. Otherwise, USCO's "nearly uniform and consistent practice" was that it did not make such contributions.

According to the Fund, however, the "Trustees of the Fund have consistently required all employers to make contributions" for "temporary employees supplied by temporary staffing agencies to the contributing employer who perform work within the scope of

and/or covered by the collective bargaining agreement."

## III. DISCUSSION

### A. Summary Judgment Standard

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour, 63 F.3d at 37 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" Rogers, 902 F.2d at 143 (quoting Anderson, 477 U.S. at 249-50) (citations and footnote in Anderson omitted). The Court must "view the facts in the light most favorable to the

non-moving party, drawing all reasonable inferences in that party's favor." Barbour, 63 F.3d at 36.

**B. Contract Interpretation**

The sole disputed issue is the meaning of the term "temporary employee" in the CBAs. The Fund claims that the temps from the temporary staffing agencies are "temporary employees" and thus, that USCO is obligated to make contributions on their behalf. USCO claims that these temps are "temporary workers" not "temporary employees" of USCO and thus, that USCO is not obligated to make contributions on their behalf.

Section 515 of ERISA provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145 (2000). In a § 515 ERISA claim, "[i]t is the collective bargaining and contribution agreements [which] establish the employer's obligation to the pension fund." Central States, Se. & Sw. Areas Pension Fund v. Kroger Co., 73 F.3d 727, 730 (7th Cir. 1996) (quoting Central States, Se. & Sw. Areas Pension Fund v. McClelland, Inc., 23 F.3d 1256, 1258 (7th Cir. 1994)).

An ERISA fund's decision that contributions are due are "reviewed under a deferential arbitrary and capricious standard where . . . the language of the underlying plan reserves

discretion to the" trustee to interpret the language of the plan and resolve disputes. Pari-Fasano v. ITT Hartford Life & Accident, 230 F.3d 415, 418 (1st Cir. 2000) (§ 1132(a)(1)(B) action challenging denial of benefits); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989) (§ 1132(a)(1)(B) action challenging denial of benefits); Wisconsin VFCW Unions & Employers Ins. Co. Health Plan v. Woodman's Food Market, Inc., 348 F. Supp. 2d 1005, 1007-08 (E.D. Wis. 2004) (§§ 1132(a) and 1145 action).

A contract that affects rights protected by ERISA is subject to interpretation under the rules of decision of federal common law. Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995). One well-known canon teaches that "contracts containing unambiguous language must be construed according to their plain and natural meaning." Id. (citing Burnham v. Guardian Life Ins. Co., 873 F.2d 486, 489 (1st Cir. 1989)). "Contract language is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." Id. (quoting Fashion House, Inc. v. K Mart, Corp., 892 F.2d 1076, 1083 (1st Cir. 1989)). Regarding the use of extrinsic evidence:

> As a general rule, a court should not consider extrinsic evidence to give meaning to a contract unless the contract's terms are vague or ambiguous. However, if the evidence is not offered to infuse the contract with meaning, but only to demonstrate that a term is vague or ambiguous in the first place, then the

> situation may be different; courts sometimes may ponder extrinsic evidence to determine whether an apparently clear term is actually uncertain.

Id. at 179 (citations omitted).

The Fund relies on the language of the Standard Participation Agreement, which USCO signed as "Mandatory Contract Language for Pension Fund," which requires payments for every "regular, probationary, temporary or casual employee." Because every word in a contract should be given significance, the Fund argues that a "probationary" employee is different from a "temporary" employee. See Browning Ferris Indus. of Puerto Rico, Inc. v. Union de Tronquistas, Local 901, 29 F.3d 1, 2 (1st Cir. 1994) (citation omitted) (stating that courts seek to "render no term meaningless" in construing contract language). The Fund contends that temps perform the same stocking, loading and unloading of trucks and shipping and receiving of merchandise as are performed by bargaining unit employees, and that this kind of work is within the scope of the CBAs. As such, the Fund asserts that the temps sent to perform work covered by the CBAs from the staffing agency who work less than 30 days are "temporary employees" covered in the mandatory contract language that USCO signed.

USCO highlights Article 10 in the new 2001-2006 CBA, which indicates that a "temporary worker" is different from a "temporary employee." USCO argues that the injection of the new term "temporary worker" in the 2001-2006 contract creates an

ambiguity and points to extrinsic evidence, which indicates that the issue of payments for working employees from the staffing agencies was a topic of negotiation, to support its contention that this new language was inserted to show the distinction.

The Fund disagrees that this was the purpose of the language and points to the course-of-performance under the CBAs, under which USCO made contributions for the temps from the staffing agencies. USCO now responds that these payments were a mistake.

The Fund prevails for two reasons. First, the 1996-2001 CBA requires that USCO pay contributions for "temporary employees," and there is no provision referring to a category of "temporary workers." Arguably, Article 10 in the 2001-2006 CBA creates an ambiguity by establishing a new category of "temporary workers," and the extrinsic evidence on the genesis of this new provision is disputed. Nonetheless, the Pension Article of the 2001-2006 CBA states explicitly that "[t]his Pension Article shall supersede and prevail over any other inconsistent provisions or articles contained within" the agreement. (art. 15(a).) Therefore, contributions must be made for temps so long as they are "employees."

Second, the Trust Agreement provides that the trustees of the Fund shall have the power to construe the language of the Trust Agreement and resolve disputes so long as the trustees act in good faith. There is no evidence of bad faith here. The trustees of the Fund reasonably concluded that the temps from the

agencies were "employees" within the meaning of ERISA and the Trust Agreement. See 29 U.S.C. § 1002(6) (2000) (defining "employee"). The First Circuit has held that whether or not a temporary worker is a common law employee is not dispositive of whether he is entitled to benefits under ERISA because "it is the language of the Plan, not common law status, that controls." Edes v. Verizon Commc'ns, Inc., 417 F.3d 133, 137 (1st Cir. 2005) (quoting Kolling v. Am. Power Conversion Corp., 347 F.3d 11, 14 (1st Cir. 2003) (involving an ERISA plan that explicitly excluded employees who were not paid directly by the company)). Here, however, there is no explicit definition of "employee" in the Plan. Therefore, the Fund correctly invoked the common law test. In Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318 (1992), the Supreme Court held that the meaning of the term "employee" in 29 U.S.C. §1002(6) should be construed under the common law test for determining who qualifies as an ERISA "employee." That common law test provides:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and

the tax treatment of the hired party.

Id. at 323-24 (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-752 (1989)). "[I]n most situations, the extent to which the hiring party controls 'the manner and means' by which the worker completes her tasks will be the most important factor in the analysis." Alberty-Velez v. Corporacion de Puerto Rico Para La Difusion Publica, 361 F.3d 1, 7 (1st Cir. 2004). "A court must tailor these factors to the relationship at issue." Id. at n.7.

Many factors in the Darden test favor the Fund's assertion that the temps are employees of USCO. Most significantly, USCO maintains control over the manner in which the temps complete their tasks. USCO supervisors and employees train the temps, advise them as to USCO's procedures and rules, decide which projects the temps are to perform, and discipline them. No one from the temporary staffing agency appears on-site at USCO to supervise the temps, and the work undertaken by the temps occurs solely at the USCO warehouse in Franklin. Under the terms of the CBAs, USCO is also responsible for supplying all tools, materials, and protective devices. USCO is in the business of distribution and warehousing, and the work done by temps is part of USCO's regular warehouse business. The temps perform tasks such as unloading trucks and labeling and ticketing merchandise, which are within the scope of and covered by the collective bargaining agreement. While the temps are occasionally limited

in which tasks they may perform, USCO generally has the right to assign additional projects. Temporary staffing agencies servicing USCO, such as Adecco, are also required to list USCO as an alternate employer on insurance forms.

USCO points to other factors which favor its position that the temps are not employees, including:

- USCO does not directly hire or fire temps.
- USCO does not pay temporary workers, does not provide leave or other benefits, and does not pay payroll or social security taxes.
- The shift for temporary workers is different from the shifts for USCO employees.
- USCO does not select which temps it receives from a temporary staffing agency, and USCO does not keep any temp longer than thirty consecutive days.
- Temps use different methods of accounting for their time.
- Temps are not subject to the same disciplinary process afforded bargaining unit employees.
- While USCO supervises the temps when they are on site, the work is basic and menial.

While these factors support both sides, the Fund has presented substantial evidence to support its conclusion that the temps from the staffing agencies who do warehouse work are covered by the CBAs and are ERISA "employees." The Fund's decision is neither arbitrary nor capricious, and as such, the Court finds that USCO is required to make contributions for the hours the temps work under both CBAs.

**CONCLUSION**

Defendant's motion for partial summary judgment is **DENIED**. Plaintiff's motion for partial summary judgment (Docket No. 21)

is **ALLOWED** on Counts I and III. The parties shall commence damages discovery.

**S/PATTI B. SARIS**
United States District Judge